540

DREWRY *v.* DREWRY.

4-8708                                    216 S. W. 2d 888

Opinion delivered January 31, 1949.

H. G. *Partlow* and *Hale & Fogleman,* for appellant.

*Bruce Ivy,* for appellee.

GRIFFIN SMITH, Chief Justice. Although the Chancery suit seeking a divorce was filed by Dorothy Drewry, and her husband, Walter, was willing that the decree be granted, each sought custody of Peggy Jo—born in June 1943, while the father was with the armed forces overseas.

Dorothy and Walter were married in May 1941 and lived together nearly thirteen months before he enlisted. While serving in New Zealand and other Pacific areas communication with Dorothy was interrupted, although there is testimony that during the first few months of separation she wrote four or five times a week. For a short period after enlisting Walter was stationed at Ft. Oglethorpe, Georgia, where Dorothy and Walter's mother saw him. This was the last time husband and wife were together until November 9, 1945, Walter having sailed June 6, 1943. Thirteen days later Peggy Jo was born. Dorothy was then living with Mr. and Mrs. G. O. Drewry at Osceola. They are Walter's mother and father.

When the child was four or five months old Dorothy left it with Walter's parents and procured employment at the Blytheville Air Base. She was then drawing an "allotment" of $80 per month and claims to have paid Mrs. Drewry $30 per month for taking care of the baby. The grandparents contend that when Dorothy took the position at Blytheville she told them to keep the baby— she wanted them to have it "as their own." This is disputed.

Before the war Walter was a telegraph operator and was stationed at Turrell, Ark., when he and Dorothy

married. At the time the divorce action was tried he was employed at Aliceville, Alabama. In the meantime his father, a section foreman for the St. Louis, San Francisco Railroad, had moved with his wife to Portageville, Mo. None of the testimony reflects upon the character of Walter's parents.

Testimony relating to essential facts is not contradictory in any sweeping sense, although the construction each principal places upon it obviously serves self-interest. Emphasis by witnesses follows the usual pattern of cases similar to this.

Walter says that news of the baby's birth reached him at Veti Vuvu Island in a message from his father February 10, 1943, and three weeks later his wife's letter came. For a short period he was in a casualty camp at Leyte, one of the Philippine Islands where some of the hardest fighting in the Pacific occurred.

After Dorothy started to work at the Air Base her letters contained references to matters not compatible with assurances formerly made, and finally infrequency of communication and unfounded accusations convinced Walter that something was wrong. Even so, according to Walter's version of the relationship, he determined to make the best of it, thinking that with his return to Blytheville and a resumption of the marital status they would be able to maintain unity as a family.

Upon arriving in California October 23, 1945, Walter telegraphed Dorothy, mentioning the day he expected to arrive at Blytheville, and asking her to meet him with the baby he had not seen. In making this request he reiterated what he had said to Dorothy when he left her in 1943 for an undisclosed destination and an unforeseeable destiny. . . .

When Walter reached Portageville and went to his father's home at four o'clock in the morning, the baby was with its grandparents, but Dorothy was not. He then went to the Blytheville residence of Mrs. J. W. Wright, where Dorothy boarded. Mrs. Wright's daughter testified that during the two-year period Dorothy roomed at her

mother's, Dorothy consistently kept engagements with men, one of whom was "Bob."[1] Walter had testified that Dorothy mentioned "Bob" in her letters after she became remiss as a correspondent.

Following conversations with Mrs. Wright, Walter left, but returned at 1:30 a. m. From a distance he saw Dorothy get out of a car bearing a Missouri license. The "fellow" drove off before any words were spoken, and Dorothy went into the house. At first she refused to see appellee, but later the two went to a cafe. When Walter received no encouragement, they returned to the Wright home, where the husband says he stood in front of the house ". . . and cried and begged her to come on and live with me so we could make a home for the baby, that we were the ones to rear it, but she replied, 'You can take the baby and go to hell with it' ". Continuing the testimony, the witness said: "I then asked, 'Are you completely through with both of us?', and she said, 'Yes, hell yes' ". Walter's testimony relating to a subsequent effort at reconciliation is printed in the footnote.[2]

Dorothy denied most of the things Walter says she told him, and she heatedly resented the inference of improper conduct with Lawrence. The only admission in this respect was that "Bob", as a friend, had driven her to and from work for several months.

[1] Walter Drewry testified that when he went to Mrs. Wright's home the night of November 9, Mrs. Wright said to him, "Son, I don't intend to tell you a lie, because I have a daughter of my own; your wife has been going, and is still going, with a fellow by the name of Robert Lawrence, of Steele, Missouri." (It was shown that Lawrence was "a family man"—presumptively married, but separated from his wife.)

[2] The testimony was: "I went back to see her the next night. I got there about 6:30 and knocked on the door. Just as I knocked the telephone rang. Mrs. Wright started to answer it, but Dorothy said she would answer it. She was all dressed up to go out. I said 'Dorothy, I would like to talk with you.' She said she didn't care anything about seeing me, that the answer was given last night 'and it still stands.' I told her I came back to ask her to live with me so we could make a home for the baby. She said she didn't care any more about the baby than she did for me. I told her we could make a good home for the baby if we were both willing, and I told her I was willing and that I wanted us to live together and make a home for the baby. She said she had to leave, so I left and caught a bus back to Portageville."

In an amendment to her divorce action—filed December 8, 1945—Dorothy alleged three years of separation without cohabitation, and in her testimony contended that time ran from the date she left the home of Walter's parents in September 1944. In a former pleading the allegation was that separation took place May 26, 1942—the day Walter left for Ft. Oglethorpe. Undisputed proof is that at the time Dorothy later asserted the separation occurred, the young couple fondly embraced and expressed words of endearment.

While the suit was pending, Dorothy went to Portageville and arbitrarily assumed custody of the child. For a time it was kept with Dorothy's sister who operates a liquor store for her husband. The husband was addicted to drink, at times became boisterous, and husband and wife were not congenial.

Seemingly, in an effort to offset environmental inferences and the suggestion even a lawfully conducted liquor store was not an appropriate place for Peggy Jo, Dorothy procured employment as a beauty shoppe operator, rented an apartment, and undertook to care for the child by taking it to work with her, or sometimes employing another to assist.

None of the witnesses thought the arrangements made by Dorothy were conducive to juvenile welfare; nor does it appear that Walter is in a position to bestow upon the child the attention it deserves. The record does not show that the mother was immoral, nor was she without maternal love. Perhaps apparent necessity caused her at times to choose the easier way—a way not best for Peggy Jo. But, in so far as his baby is concerned, Walter has never had a chance. A volunteer in his country's service, a private serving nearly half the earth's girdle away from home, he was honorably discharged only to find that, without fault of his own, some intervening intangible had made shipwreck of his plans for home and family.

Dorothy's only complaint is predicated upon the oft-repeated assertion that Walter was a mother's boy, com-

pletely under the domination of the parent, to the exclusion of the consideration to which she was personally entitled. She was not willing to experience inconveniences, a measure of comparative poverty, and lonely rural life during the period Walter followed the flag.

The decree of divorce was granted on Walter's cross-complaint, based upon a finding that Dorothy had deserted him.

After hearing evidence copied in more than 250 pages of typewritten matter, the Chancellor concluded that Walter was entitled to custody of Peggy Jo during nine months of each year, and that Dorothy should have her for three months. We are not willing to say the result of this decree is not a just determination of the issues; but we would emphasize what the trial Court must have had in mind; that is, that the child should be kept by the grandparents, with appropriate guarantee for surrender of custody during the annual periods expressed in Dorothy's behalf. The cause is remanded for a supplemental order to this effect, but in other respects the decree is affirmed.

SMITH, FRANK G., J., dissenting. It is no doubt true that appellant deserted appellee without just and legal excuse, and that he is entitled to the decree of divorce awarded him. But this litigation concerns not the divorce, but the custody of a child, a little girl who was born in January, 1943. The suit which culminated in the decree from which is this appeal, was filed December 6, 1945, at which time the child was only three years old, and she was less than five years old when the final decree was rendered.

There are conflicts in the testimony which I shall not review, and which cannot be reconciled. Appellant's excuse for her abandonment of her husband is that her mother-in-law's domination became intolerable. But I think there is no credible testimony that she ever abandoned the child. The testimony of the mother-in-law that appellant told her she did not want the child and that she, the grandmother, might have it "as her own" does not comport with appellant's attitude throughout

the entire case. The majority opinion recites that "The record does not show that the mother was immoral, nor was she without maternal love." Appellant never, at any time, abandoned the custody of her child. It is true that for a time she left her child with her mother-in-law, but she did this in order that she might earn her support and during all the time the mother-in-law had the custody of the child, appellant contributed to its support, not only from the government allotment, but also from her own earnings.

The litigation is in fact between the mother of the child and its grandmother, as appellee admits he had no home to which the child could be taken, but he testified that he could take it to Alabama, where he was employed, and have a negro girl take care of it.

The grandmother herself has no home of her own, but lives in a section house in Missouri, furnished the grandfather as a section foreman. On the other hand, Miss Polly Wilson testified that she is a child welfare worker, in charge of that work for the whole of Mississippi county, and that she has known appellant for two years, has advised her about the child, then living with its mother in an adjoining apartment. She further testified that the child and its mother loved each other, and that the mother is a fit and proper person to have its custody.

We have frequently, and recently, had many cases involving the custody of infant children, in all of which it was said the primary consideration is the welfare of the child, and in my opinion it is always to the best interest of a little girl four years old, that the mother have its custody, unless she abandoned it, or is shown to be a wholly unfit person.

One of the most recent of these cases is that of *Aucion* v. *Aucion*, 211 Ark. 205, 200 S. W. 2d 316. There much testimony was offered tending to show the infidelity of the mother, but it was said that it would be better for all concerned that the unsavory evidence adduced on this issue be left out of the opinion. Yet it was held that the custody of the child, a three year old girl,

should be awarded the mother on account of the child's tender age.

Here the majority find that the charge of immorality against the mother was not sustained, and it is undisputed that regardless of any past indiscretions, if such there were, the mother is now leading a correct life, and I think the permanent custody of the child should have been awarded to her.

The majority opinion awards the custody of the child for three months every year to the mother, which imputes the finding that she is not an unfit person to have the custody of the child, but I think she should have been awarded the permanent custody of the child.

In my opinion the divided custody of a child, and especially a small child, is always unfortunate and should be ordered only in exceptional cases, and this is not one of them. The contending parties love the child, of course, and want its custody, otherwise there would be no litigation, and it is too much to expect of human nature that the person having temporary custody, at particular times, would not attempt to win its affection to a point of preference on the part of the child.

In many instances this is done openly, and in other instances almost unconsciously, yet insiduously affecting the child's attitude towards its parents, with the too frequent result that the child does not have the proper love and respect for either parent.

It was said long ago by the Savior that a man cannot serve two masters, nor can a child. If the custody is changed from one person to another the child is bewildered, and does not know who to obey and there can be no proper discipline under these circumstances. There would be the constant fear, if authority were assumed, and correction employed, that the child would learn to prefer the parent more indulgent.

In my opinion the custody of small children should be awarded to one parent with the right of visitation by the other.

But apart from all these considerations, the little girl is too young to have her custody taken away from her mother for any part of the time, and I therefore dissent as I think the decree should be reversed and the permanent custody of the child awarded to appellant, its mother, with visitation rights to the father and his mother.